FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2009 JUN -9  P 3: 42

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| BLUE RIDGE PARTNERS <br> MANAGEMENT CONSULTING, LLC, <br> 1350 Beverly Road, Suite 115 <br> McLean, Virginia 22101 | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civ. No. _1:09CV644-AJT- TRJ_ |
| BRIAN D. METHVIN, <br> 10307 Mystic Meadow Way <br> Oakton, Virginia 22124 | ) ) ) ) | |
| Defendant. | ) ) ) | |

## CIVIL COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION

COMES NOW, Plaintiff, Blue Ridge Partners Management Consulting, LLC ("BRP"), by counsel, and states as follows for its Complaint against Brian D. Methvin ("Methvin").

### INTRODUCTION

1.    This matter is before the Court for the limited purpose of seeking temporary injunctive relief in aid of arbitration.

2.    BRP, through independent forensic examination, has discovered direct evidence of the misappropriation of its confidential and proprietary information; efforts to destroy, modify and otherwise "wipe" evidence of such conduct; and, having forensically discovered the "wiping efforts," now has evidence of a plan to set up a competitive business venture called Azera Partners ("Azera").

3. This new company, along with an umbrella of other companies referred to as the "Prius Alliance" intends to compete with BRP in the same line of business in which Methvin was engaged. Further, BRP's independent forensic examination has revealed evidence that Methvin plans to usurp BRP employees, recruits, customers, opportunities and its confidential information, proprietary materials and trade secrets.

## THE PARTIES

4. BRP is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Fairfax County, Virginia. BRP is a limited liability corporation that engages in management consulting and ongoing operating services, particularly in the area of revenue management.

5. Methvin is a natural person residing at 10307 Mystic Meadow Way, Oakton, Virginia. He was employed by BRP from on or about April 1, 2008 through May 31, 2009.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Count Six and supplemental jurisdiction over all other counts pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Methvin pursuant to Virginia Code § 8.01-328.1 as Methvin resides and was employed in the Commonwealth of Virginia, transacted business in the Commonwealth and because his acts have injured BRP in the Commonwealth.

8. Venue is also proper in this matter under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in the Eastern District of Virginia.

9. Injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65 and the Managing Directors Compensation Agreement ("MDCA"), attached hereto as Exhibit 1.

## FACTUAL ALLEGATIONS

### *BRP Employed Methvin as a Managing Director*

10.    BRP is a management consulting firm with several core service offerings focused on revenue growth and related margin improvements – one of which focuses exclusively on a service that helps clients understand the factors affecting pricing, assess their own pricing activities, formulate rational pricing strategies and improve pricing execution so they can maximize profits (hereinafter, "Pricing Consulting").

11.    BRP hired Methvin as a Managing Director on or about April 1, 2008, and during the course of his employment became the leader of its Pricing Consulting service offerings.  As a Managing Director, Methvin reported to BRP's Managing Partner James Corey ("Corey").

12.    During his tenure with BRP, Methvin was involved in Research and Development (or Intellectual Property Development) to develop specific concepts, approaches, methodologies and processes within the Pricing Consulting business.  Methvin was also in charge of developing and facilitating client relationships, consulting engagements and sales initiatives within this service offering.

13.    Methvin was responsible for employee training in the Pricing Consulting line of business and created both external executive briefing documents (used for marketing presentation) as well as internal training materials for BRP employees – materials maintained as confidential that were not shared with third parties or potential clients.

14.    Methvin was one of five (5) Managing Directors at BRP through 2008 and one of four (4) Managing Directors as of his termination date on May 31, 2009.  In addition to the Managing Directors, BRP has approximately 12 additional full time employees on staff.

3

15.    As a Managing Director, Methvin had extensive knowledge of BRP's pipeline opportunities within the Pricing Consulting business as well as the other BRP lines of business.

### *Methvin's Contractual Obligations to BRP*

16.    Methvin signed a Managing Director Compensation Agreement ("MDCA") with BRP on or about August 9, 2008, a copy of which is attached hereto as Exhibit 1 and incorporated herein by reference.  The MDCA states that it is governed by Delaware law.

17.    The MDCA describes the terms of Methvin's employment with BRP and specifically states in relevant part that "[d]uring your employment, you agree to devote your full business time, attention, and energies to performing those duties."[1]

18.    Exhibit A to the MDCA contains several discrete post-employment restrictions that apply to Methvin from the date his employment with BRP terminates through the "first anniversary of the date [Methvin's] employment with [BRP] ends for any reason."

19.    In his MDCA with BRP, Methvin expressly promised that he would not:

[d]irectly or indirectly, be <u>employed by</u>, lend money to, or engage in any <u>Competing Business</u>.  That prohibition includes, but is not limited to, acting, either singly or jointly or as agent for, or as an employee of or consultant to, any one or more persons, firms, entities, or corporations directly or indirectly (as a director, independent contractor, representative, consultant, member, or otherwise) that constitutes such a Competing Business.[2]

\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[1]    On April 22, 2009, the parties entered into a transition outline detailing the terms and circumstances regarding Methvin's departure from BRP (the "Transition Agreement").  The Transition Agreement stated that Methvin "may spend a portion of his time preparing for his career change.  [However,] [h]e will make a good faith effort to ensure these activities do not interfere with his client work."

[2]    "*Competing Business* means any service or product of any person or organization other than the Company and its successors, assigns, or subsidiaries (collectively, the "*Company Group*") that competes with any service or product of the Company Group provided by any member of the Company Group during your employment. *Competing Business* **includes any enterprise engaged in revenue management consulting and ongoing services or research around the same revenue management topics.**" (emphasis in original).

<u>solicit any person or entity who is or was a customer</u>, prospect, or client of the Company Group with whom you were directly engaged.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>hire away or endeavor to entice away from the Company Group any employee</u> or any other person or entity whom the Company Group engages to perform services or supply products and including, but not limited to, any independent contractors, consultants, engineers, or sales representatives or any contractors, subcontractor, supplier, or vendor; or hire any person whom the Company Group employs or employed within the prior 12 months.

Exhibit A to Exhibit 1 (emphasis added).

20.     Exhibit A to the MDCA specifically provides for injunctive relief.

You agree that, if there is a breach or threatened breach, the Company or any member of the Company Group will be entitled to obtain a temporary restraining order and/or preliminary or permanent injunction restraining you from engaging in activities prohibited by any provisions of Exhibit A or such other relied as may be required to specifically enforce any of the covenants in this Exhibit A.

<u>Id</u>.

21.     Exhibit B to the MDCA is a dispute resolution provision that provides BRP the right to "seek emergency equitable relief from a court of competent jurisdiction." More specifically, Exhibit B expressly states that "[t]his Dispute Resolution provision does not preclude a party from seeking equitable relief from a court (i) to prevent imminent or irreparable injury or (ii) pending arbitration, to preserve the last peaceable status quo, nor does it preclude the parties from agreeing to a less expensive and faster means of dispute resolution."

22.     BRP also invited Methvin to become a Member of the Company pursuant to the terms of the Amended and Restated Operating Agreement (the "Operating Agreement"), a copy of which is attached hereto as Exhibit 2 and incorporated herein by reference (exhibits thereto omitted).

23.     Methvin signed the Operating Agreement on or about June 2, 2008.

24.     In the Operating Agreement, Methvin agreed that as an Active Member and

5

Manager he would:

> [p]resent to the Company all investment or business opportunities of which any of the foregoing become aware as a result of or in connection with his or her performing his or her duties and obligations to the Company."
>
> **************
>
> Within three days of the occurrence of any Dissociation Event, the Dissociated Member shall return to the Company any and all property, real or personal, tangible or intangible, that is owned or used by the Company, including, without limitation, money, brochures, presentations, training materials, chart documents, phone lists and any and all other materials or data whether in written or electronic form, and any and all patents, patent applications, trademarks, trade names, service marks, copyrights, inventions, production methods, licenses, formulas, know-how, trade secrets and other proprietary rights (collectively, "Company Property").
>
> **************
>
> Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to any third party or, except in furtherance of the business of the Company, use, and shall use its reasonable efforts to prevent its Affiliates, employees, agents, and representatives from disclosing to third parties or, except in furtherance of the business of the Company, using, without the prior written consent of the Manager (a) any information that pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the business of the Company, (b) any information that pertains to non-public or proprietary information of any Member or the Company, or which any Member has labeled in writing as confidential or proprietary, or (c) any Company Property, irrespective of whether such Company Property has been labeled as confidential or proprietary; *provided, however*, that any Member may disclose such information to its Affiliates, employees, agents, and representatives and as otherwise required by any court, supervisory authority, administrative agency or applicable law.

Exhibit 2 at ¶¶ 2.21, 8.6, 10.12 (emphasis added).

### *BRP's Computer Systems and Protection of Confidential, Proprietary, and Trade Secret Information*

25.     On November 26, 2008, BRP issued Methvin an IBM Lenovo T60 laptop computer, bearing serial # L3-AK271 0611, a replacement for a previously issued laptop that developed a malfunctioning screen.

26.     In accordance with company policy, Methvin was required to save corporate

documents both on his laptop as well as on a WIKI server for sharing knowledge capital that was hosted by the company on an Internet site. Despite specific instruction, Methvin repeatedly refused to back up his BRP-issued computer as specifically required in BRP's company handbook.

27. In addition to the laptop computer, Methvin had a BRP email account that was hosted by an external company. Methvin, like all other BRP employees, was instructed to conduct BRP business by electronic mail using his BRP-issued email account.

28. BRP has invested considerable time, resources and capital in establishing confidential information, proprietary materials and its trade secrets, as well as the cultivation of relationships with its clients in this highly competitive industry.

29. Section 1.12 of BRP's Employee Handbook addresses the protection of confidential business information and trade secrets. Such confidential information includes, but is not limited to: "Intellectual property (training material, conference materials, client cases, etc.), Client lists, Client information, Financial information, Marketing strategies, [and] Pending projects and proposals."

30. As described above, Methvin agreed to keep all BRP proprietary and trade secret information confidential. Further, he agreed to keep all company property confidential, "irrespective of whether such Company Property has been labeled as confidential or proprietary," with the exception of information that is required to be disclosed by a court, administrative agency, or applicable law." Exhibit 2 ¶ 10.12.

### *The Methvin Transition Plan*

31. As early as March 2009, Methvin communicated to BRP Managing Partner, Corey, that he (Methvin) would like to discuss a transition plan that would precipitate his

departure from the Company.

32.     Throughout the last weeks of March and first weeks of April, Corey and Methvin worked towards an amicable transition plan which was ultimately memorialized on April 22, 2009 and attached hereto as Exhibit 3 (the "Transition Agreement").

33.     The transition plan noted that Methvin's membership and employment would cease on May 31, 2009 and that until that time Methvin would continue to serve as a Managing Director for existing clients and other BRP clients as assigned.  Methvin specifically agreed to "make the same good faith efforts to serve those clients as he did prior to" the transition agreement.

34.     The Transition Agreement contemplated that Methvin would be able to "spend a portion of his time preparing for his career change[,]" and he would be permitted to "carve out" certain clients and activities from the post-employment restrictions set forth in the MDCA.  However, at all times Methvin was required to make a good faith effort that any time spent preparing for his "career change" would not "interfere with his client work."   The Transition Agreement did not permit Methvin to usurp or misappropriate any BRP documents or confidential information.

35.     Methvin was also instructed to preserve specific client files on an external hard drive and to return his BRP-issued laptop with all company files on or before May 31, 2009.

36.     On May 31, 2009, Methvin's employment with BRP ceased.  He returned his BRP-issued laptop via personal pick-up at his home on that day.

### *First Advantage Conducts Forensics on Methvin's Computer*

37.     On June 1, 2009, First Advantage Litigation Consulting ("First Advantage") was retained to perform a computer forensic examination of a laptop computer hard drive that

had been issued by BRP to Methvin.

38.     On June 1, 2009, First Advantage received via courier, an IBM Lenovo T60 laptop computer, bearing serial # L3-AK271 0611. The internal hard drive of the laptop was a 60 GB Toshiba, model # MK6034GSX, bearing serial # Y65ST1I5T.

39.     A forensic bit-stream image of the computer hard drive was acquired and a forensic examination was begun on June 2, 2007.

40.     Through an initial overview of the file structure of the hard drive, First Advantage identified five (5) deleted folders with names that appeared to be random, through the use of numbers and letters. Four of these folders contained 3000 empty files and the fifth folder contained 280 empty files. This structure is indicative of wiping utilities.

41.     First Advantage then reviewed the computer registry files and found references to a file wiping utility, Eraser. Using the Eraser utility as a search term, First Advantage was able to identify Internet Explorer history files that showed the searches for Eraser, the downloading of the software from Download.com, and the accessing of the installed software. The "User Assist" key in the registry shows that the software had been installed on the computer, there is a single folder titled Eraser, but it does not contain the application. Another location, the Prefetch folder also shows the use of the Eraser software.

42.     First Advantage's examination also identified the use of the data migration utility, Windows Easy Transfer, this was installed on May 24, 2009. This utility allows the transfer of data from Windows XP, 200 or Vista computers to a different Windows Vista computer.

43.     First Advantage identified a log of successful data transfer (called "migrep.html") between computers on May 24, 2009.

44.     The data transfer log shows that Methvin's Outlook email files and PST files, not present on the computer he returned to BRP, were identified on the data transfer log.

45.     The Eraser utility was run on May 28, 2009.

46.     On Saturday, May 30, 2009, the day before Methvin returned the BRP computer, a folder called "Blue Ridge Work" was copied from the Desktop to the user's My Documents folder, copied again to the folder My Google Gadgets and finally copied to a different profile, All Users, Documents.

47.     The 580 files within the folder called "Blue Ridge Work" are identical with respect to the date of creation (November 28, 2009) and not a single one was modified or edited since that date. Otherwise stated, each file returned to BRP on the Methvin computer are all the same and remain unchanged from the date the file called "Blue Ridge Work" was originally created – November 28, 2008 – the very day Methvin received the BRP laptop referenced in Paragraph 38.

48.     There are approximately 2,500 user created files (Microsoft Word, Excel, PowerPoint PDF and compressed files) residing on the computer. Of these, there are fewer than 500 that did not come from the three folder transfers listed in Paragraph 46.

49.     Thus, it appears that Methvin transferred mass amounts of data from his BRP-issued laptop to another device on May, 24, 2009; thereafter, attempted to wipe evidence of the file transfer; and only after the attempted deception was completed, he copied a file called Blue Ridge Work from November 28, 2009 to the computer he then returned to BRP on May 31, 2009.

50.     BRP is without record of Methvin's work from November 28, 2009 through May 31, 2009, subject to documents he may have sent to other BRP employees in the normal

course of his work.

### *Detailing the Confidential Information Misappropriated by Methvin*

51.     As noted previously, the migrep.html data log, establishes the successful transfer of information by Methvin from his BRP-issued computer.  A cursory review of the log evidences that Methvin is in possession of the following categories of proprietary documents: live BRP proposals; internal pricing presentations for BRP employees; client work product – specifically including proposals, service offerings and deliverables; pricing methodologies; versions of the Firm's client pipeline in Microsoft Excel form; intellectual property for inclusion in yet to be disseminated publications; BRP's financial statements and cash flow; marketing materials; and, lists of Private Equity Firms and Contacts.

52.     Without conducting forensics on the computer to which Methvin transferred the above-reference data, BRP cannot know what other confidential, proprietary and trade secret materials remain in Methvin's possession.

53.     Moreover, Methvin has engaged in a pattern of behavior evidencing an intent to create a competitive venture called Azera Partners under a "brand umbrella called Prius Alliance."

54.     According to a series of emails between BRP Managing Directors Thomas Puglisi and Methvin dated as early as April 28, 2009, Methvin intends to create a consulting firm dedicated to the very pricing business he oversaw while at BRP.

55.     Methvin has solicited Puglisi to leave BRP and to assist him in forming his new company.  Indeed, on April 28, 2009, Methvin (using his Yahoo private email account) contacted Puglisi at his BRP email account stating "I am starting down a path to create a new Firm.  I need to know when/if you want to join."

56.   Puglisi and Methvin engaged in a series of email communications, the full scope of which is unknown presently, discussing names for the new firm, the overall architecture for an alliance of firms that includes reference to a firm operated by a friend of Puglisi and Methvin, as well as an existing BRP third party sub-contractor.

57.   Methvin has interviewed at least two recruiting candidates in BRP's pipeline with the specific intent of having them work for his new venture as opposed to BRP.

58.   BRP invested significant time, funds and resources to build its recruiting candidate pipeline, and the list is deemed Confidential and has independent economic value to BRP. Indeed, Methvin used his BRP email account to communicate with at least two candidates and apparently met with them as recently as May 27, 2009. According to the emails, specific projects were discussed with the potential candidates.

59.   The recruiting pipeline is maintained in a proprietary document that identifies the name, position, source, status of availability as well as whether the individual has been vetted by BRP and notes related to the specific individuals' credentials and qualifications. This list is maintained primarily by Puglisi. Upon information and belief subject to forensic analysis of Methvin's personal computer, he is in retention of the BRP recruiting pipeline document.

60.   Methvin's use of contractors from BRP's recruiting pipeline will deprive the company of revenue associated with using these candidates at BRP's client projects.

61.   Evidence exists that Methvin was engaged in discussions with Puglisi to usurp a due diligence project for an existing BRP client. Puglisi attempted to tender a resignation to BRP and begin a transition period on or about April 23, 2009. At the time he discussed his resignation, Puglisi had failed to disclose information related to a due diligence project for an existing BRP client.

62.     Rather than accept Puglisi's request for a transition period, BRP indicated that Puglisi's resignation more likely would be accepted immediately.  Upon discovering BRP's position, Puglisi decided not to pursue the discussion of his resignation and only thereafter disclosed the due diligence project to BRP.

63.     Upon information and belief, Methvin has attempted to use the services of current BRP employees to assist him in research and formation activities for his new company and has solicited BRP employees to join him at his new company.

64.     Furthermore, Methvin is believed to have spoken with another third party, GIA, regarding giving at least one Blue Ridge Partners project to them.

65.     Evidence also exists in email traffic between Puglisi and Methvin regarding "giving projects to an individual named Kit."  Upon information and belief, Kit is Christopher Lyle, the founder and Managing Partner of Acclaro Growth Partners.  Acclaro Growth Partners is listed as a member of the brand umbrella discussed in email traffic between Puglisi and Methvin as recently as May 29, 2009.

## COUNT I
## BREACH OF CONTRACT
## (RESTRICTIVE COVENANTS IN THE MDCA)

66.     BRP realleges and incorporates by reference paragraphs 1 through 65 as though set forth herein.

67.     The MDCA is a valid and enforceable contract, by and between Methvin and BRP, supported by adequate mutual consideration.

68.     The covenants and restraints contained in the MDCA are reasonable and fair from the standpoint of the employer, the standpoint of the employee and the standpoint of sound public policy.

69. Pursuant to Exhibit A of the MDCA, and as explained above, Methvin agreed not to be "employed by, lend money to, or engage in any Competing Business" (as that terms is defined in the MDCA) for one year after his employment with BRP ended.

70. Pursuant to Exhibit A of the MDCA, and as explained above, Methvin agreed that he would not solicit any person or entity who is or was a customer, prospect, or client of BRP for one year after his employment with BRP ended.

71. Also pursuant to Exhibit A of the MDCA, and as explained above, Methvin agreed not to hire or endeavor to entice away from BRP any person whom BRP currently employs or employed within the preceding twelve months.

72. Methvin, as detailed above, has breached and will continue to breach the terms of the MDCA absent the issuance of a Temporary Restraining Order and/or preliminary injunction in aid of the arbitration required by Exhibit B of the MDCA.

73. As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered and will continue to suffer irreparable injury, as well as other damages, including lost profits, re-creation costs and loss of trade, good will, business and reputation.

## COUNT II
## BREACH OF CONTRACT
### (OPERATING AGREEMENT SECTIONS 2.21, 8.6 and 10.16)

74. BRP realleges and incorporates by reference paragraphs 1 through 73 as though set forth herein.

75. The Operating Agreement is a valid and enforceable contract, by and between Methvin and BRP, supported by adequate mutual consideration.

76. The covenants and restraints contained in the Operating Agreement are reasonable and fair from the standpoint of the employer, the standpoint of the employee and the

14

standpoint of sound public policy.

      77.    Pursuant to Section 2.21 of the Operating Agreement, Methvin agreed to "present to the Company all investment or business opportunities of which [he] become aware as a result of or in connection with his or her performing his or her duties and obligations to the Company."

      78.    Pursuant to Section 8.6 of the Operating Agreement, Methvin agreed to "return to the Company any and all property, real or personal, tangible or intangible, that is owned or used by the Company, including, without limitation, money, brochures, presentations, training materials, chart documents, phone lists and any and all other materials or data whether in written or electronic form, and any and all patents, patent applications, trademarks, trade names, service marks, copyrights, inventions, production methods, licenses, formulas, know-how, trade secrets and other proprietary rights."

      79.    Pursuant to Section 10.16 of the Operating Agreement, Methvin agreed that he would do the following:

> keep confidential and shall not disclose to any third party or, except in furtherance of the business of the Company, use, and shall use its reasonable efforts to prevent [BRP's] Affiliates, employees, agents, and representatives from disclosing to third parties or, except in furtherance of the business of the Company, using, without the prior written consent of the Manager
>
> (a)    any information that pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the business of the Company,
>
> (b)    any information that pertains to non-public or proprietary information of any Member or the Company, or which any Member has labeled in writing as confidential or proprietary, or
>
> (c)    any Company Property, irrespective of whether such Company Property has been labeled as confidential or proprietary; *provided, however*, that any Member may disclose such information to its Affiliates, employees, agents, and representatives and as otherwise required by any court, supervisory authority, administrative agency or applicable law."

80.     Methvin, as detailed above, has breached and will continue to breach the terms of the Operating Agreement.

81.     As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered and will continue to suffer irreparable injury, as well as other damages, including lost profits, re-creation costs and loss of trade, good will, business and reputation.

## COUNT III
## BREACH OF CONTRACT
## (THE TRANSITION AGREEMENT OF APRIL 22, 2009)

82.     BRP realleges and incorporates by reference paragraphs 1 through 81 as though set forth herein.

83.     The Transition Agreement is a valid and enforceable contract, by and between Methvin and BRP, supported by adequate mutual consideration.

84.     Pursuant to the terms of the Transition Agreement, Methvin expressly agreed not to compete with or solicit BRP's clients or people except as provided for in the Transition Agreement.

85.     Methvin, as detailed above, has breached and will continue to breach the terms of the Transition Agreement.

86.     As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered and will continue to suffer irreparable injury, as well as other damages, including lost profits, re-creation costs and loss of trade, good will, business and reputation.

## COUNT IV
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY

87.     BRP realleges and incorporates by reference paragraphs 1 through 86 as though set forth herein.

88.     Methvin is a former employee of BRP.   Methvin was an employee of BRP

from on or about April 1, 2008 to on or about May 31, 2009.

89.    Methvin owed fiduciary duties to BRP as a result of his employment relationship with BRP and cannot now take actions in contravention of these.

90.    During his employment with BRP, Methvin breached his fiduciary duties to BRP in multiple ways, including but not limited to:   (i) competing with BRP beyond the allowances made in the Transition Agreement, (ii) misappropriating BRP's confidential, proprietary and trade/secret information; (iii) attempting to usurp BRP's corporate opportunities; (iv) using BRP-owned property for his own competitive advantage without BRP's authorization; and (v) soliciting fellow BRP employees to join a competitive enterprise.

91.    As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered and will continue to suffer irreparable injury, as well as other damages, including lost profits, re-creation costs and loss of trade, good will, business and reputation.

## COUNT V
### VIRGINIA UNIFORM TRADE SECRETS ACT VIOLATION
### (Va. Code §§ 59.1-336 et seq.)

92.    The allegations in paragraphs 1 through 91 are re-alleged and incorporated as if set forth fully herein.

93.    BRP owns and possesses information (including software code, object code, formulas, processes, designs, documentation, program files, flow charts, specifications, developments, improvements, inventions, techniques, customer information, prospective customer information, vendor information, business partner information, accounting and other financial data, statistical data, research data, development plans, marketing plans, promotional ideas, strategies, budgets, projections, licenses, prices, costs and other confidential and proprietary information in various formats) that derives actual and potential economic value from

17

not being generally known to or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. This trade secret information includes but is not limited to BRP's internal training materials for BRP employees, pricing methodologies, marketing techniques, materials, plans and strategies; sales information, plans and strategies; client names and other information related to clients; any and all financial information; and any and all employee protected information (e.g. information protected by the Freedom of Information and Privacy Acts).

94.     BRP takes efforts that are reasonable under the circumstances to maintain the secrecy of the information described in the preceding paragraph.

95.     Methvin has unlawfully acquired, retained, transferred or otherwise misappropriated BRP's trade secrets by and through the conduct alleged herein.

96.     The acquisition of trade secret information described in the preceding paragraphs was by improper means, as it was done in breach of Methvin's contractual and fiduciary duties to maintain the secrecy of BRP's trade secret information.

97.     Methvin unlawfully disclosed BRP's trade secret information when he electronically copied and downloaded the contact information of numerous BRP customers without BRP's permission.

98.     At the time of the disclosures identified in the preceding paragraph, Methvin knew or had reason to know that his knowledge of the trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy.

99.     On information and belief, Methvin has disclosed and unless enjoined will continue to disclose BRP's trade secret information for his personal benefit, Azera Partners and/or other entities affiliated with the Prius Alliance, without the permission of BRP.

100.    At the time of the disclosures identified in the preceding paragraph, on information and belief, Methvin knew or had reason to know that his knowledge of BRP's trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy.

101.    Methvin's misappropriation of BRP's trade secret information was both willful and malicious. Methvin has engaged in a pattern of activities that were intended to cause financial injury to BRP.

102.    As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered substantial damages to be proven at trial, including but not limited to lost profits, re-creation costs and loss of trade, good will, business and reputation.

103.    On information and belief, Methvin has unlawfully profited from the actions described above.

### COUNT VI
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
**(18 U.S.C. § 1030(a)(4) –accessing a computer with authorization and using such access to obtain or alter information in the computer without entitlement to do so)**

104.    The allegations in paragraphs 1 through 103 are realleged and incorporated as if set forth fully herein.

105.    The BRP computer assigned to Methvin is a "protected computer" which is used across state lines in interstate commerce, has internet access across state lines, and was used to transfer BRP information concerning services in interstate commerce.

106.    BRP did not authorize Methvin to alter, delete or transmit the information available through his BRP-owned computer to computer and/or parties unaffiliated with BRP.

107.    Methvin exceeded his authorization with respect to a protected computer by altering and deleting information on a protected computer, as set forth herein.

108.    Through his actions, Methvin, knowingly and with intent to defraud BRP,

accessed a protected computer without authorization or exceeded his authorized access to obtain information thereby causing damage in excess of $5,000.

109.    Methvin accessed a protected computer without authorization or exceeding his authority and obtained confidential, proprietary and trade secret information, the value of which exceeds $5,000 in any one-year period.

110.    As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered substantial damages to be proven at trial, including but not limited to lost profits, re-creation costs and loss of trade, good will, business and reputation.

**COUNT VII**
**VIRGINIA COMPUTER CRIMES ACT VIOLATION**
**(Va. Code §§ 18.2-152.1 et seq.)**

111.    The allegations in paragraphs 1 through 110 are re-alleged and incorporated as if set forth fully herein.

112.    Methvin intentionally used computers and/or computer networks to make unauthorized copies of computer data, computer programs and/or software belonging to BRP.

113.    Methvin intentionally used computers and/or computer networks to embezzle computer data, computer programs and/or computer software belonging to BRP.

114.    Methvin intentionally used computers and/or computer networks to permanently remove, alter, erase or otherwise disable computer data, computer programs and/or computer software belonging to BRP.

115.    As a direct and proximate result of Methvin's unlawful conduct, BRP has suffered substantial damages to be proven at trial, including but not limited to lost profits, re-creation costs and loss of trade, good will, business and reputation.

## COUNT VIII
## PRELIMINARY INJUNCTION IN AID OF ARBITRATION
### (Against Methvin)

116.   BRP realleges and incorporates by reference paragraphs 1 through 115 as though set forth herein.

117.   According to Exhibit B of the MDCA, BRP may, "seek emergency equitable relief from a court of competent jurisdiction" in aid of arbitration and that nothing in the Dispute Resolution provisions precludes a party from "seeking equitable relief from a court (i) to prevent imminent or irreparable injury or (ii) pending arbitration, to preserve the last peaceable status quo."

118.   As described above, Methvin has breached and continues to act in breach of the MDCA, Operating Agreement, Transition Agreement, and continues to possess BRP's trade secrets, confidential information and proprietary materials in violation of several statutory prohibitions.

119.   As described above, Methvin has breached and continues to act in breach of his fiduciary duties to BRP by providing retaining possession of the files and folders he wrongfully transferred on or about May 28, 2009.

120.   As described above, Methvin has breached and continues to act in breach of his duties to BRP under the Virginia Uniform Trade Secrets Act by unlawfully acquiring and retaining trade secret information belonging to BRP.

121.   As a result of the actions described above, BRP has suffered, and will continue to suffer, irreparable harm and loss for which it does not have an adequate remedy at law.

122.   The award of injunctive or other provisional relief from this court will aid

arbitration, prevent an arbitration award from being rendered ineffectual and protect BRP's confidential information or intellectual property.

## **PRAYER FOR RELIEF**

As this matter is before the Court for the limited purpose of seeking temporary injunctive relief in aid of arbitration, BRP moves this honorable Court to issue a temporary restraining order and a preliminary injunction enjoining Methvin from:

a. Violating the post-employment restraints set forth in Exhibit A of the MDCA, until a ruling on the merits has occurred.

b. Violating Sections 2.21, 8.6 and 10.12 of the Operating Agreement, until a ruling on the merits has occurred.

c. Violating the Transition Agreement he signed on or about April 22, 2009, until a ruling on the merits has occurred.

d. Using all documents, information, data and metadata that were formally stored on BRP's computers that can be traced back to BRP's computers or that otherwise contain BRP's confidential, proprietary and/or trade secret, until a ruling on the merits has occurred.

e. Engaging in a "Competing Business" (as that term is defined in the MDCA), until a ruling on the merits has occurred.

BRP also moves this Court for an Order in aid of arbitration that Methvin must immediately return any such documents, information, data and metadata to BRP and take any and all other actions required to assist BRP in protecting its interests in any such documents, information, data and metadata.

**A jury trial is demanded.**

**BLUE RIDGE PARTNERS MANAGEMENT
CONSULTING, LLC**
By Counsel

Dated this Ninth day of June, 2009.


David L. Greenspan, Esq. (VA Bar 45420)
Sarah A. Belger, Esq. (VA Bar 67947)
McGuireWoods LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102
Telephone:  703-712-5000
Facsimile:  703-712-5050
dgreenspan@mcguirewoods.com
sbelger@mcguirewoods.com

*Counsel for Plaintiff, Blue Ridge Partners Management Consulting, LLC*


\9318267.3